on the voluntariness of the consent and the scope of the consent issue. And with that, I can go forward or if you would like to hear the chronological order of the arguments, we could let Mr. Geary go first. That doesn't matter. It's your time to proceed. Let me just say this. I think if you both agree on given issues, I don't think it would be helpful to us to have you be repetitive. So why don't we just go ahead and you make whatever arguments you've decided in whatever order you wish. And we can sort them out. And then let me add that we very much would appreciate it if you finish your time in 10, 12 minutes and you don't wish to take further time in the next case or want to shorten the next case, that's fine. We appreciate that. What we don't want and you don't want is repetition. Thank you very much. This case, just briefly overall, this case is about a traffic stop on the I-40, which is one of the main freeways that goes through Albuquerque. The officer started the traffic stop. He also had a belt tape on him for audio recording, no camera recording, but just a belt tape. And he stopped the car and he realized that the driver and the passenger only spoke Spanish. So he decided that because he was having difficulty communicating with them because he didn't speak Spanish very well, he would call a second officer to come and translate for him. He did that. And meanwhile, in the time that he was waiting for the second officer to come and translate, he asked for Mr. Martinez's driver's license, the insurance paperwork, and the car registration when she was looking at and simultaneously filling out a warning citation for him. The facts that are more pertinent to the consent were that after the traffic stop and after our argument that the traffic stop was prolonged, at that particular time, there were three officers at the scene on the side of the freeway, which was seven miles from the nearest stop. So you could say that a person could walk there, but it was pretty isolated out there. There were three sheriff's units all with their lights flashing on the side of the road by them. And at that time- In general, could you tell us, at a certain time, the arrest, this time, so that we can have a sense of, because your application here overall is that the stop was prolonged unconstitutionally. So we need to get a little sense of that. Well, overall, he stopped the car at about 7.38, 7.39 in the morning, and at that time when he stopped the car that my client was driving, he turned on his belt tape, as I indicated. He called the other officer when he realized that he couldn't speak Spanish well enough to communicate with the driver and the passenger. And he, as I indicated, the other officer, Officer Mauricio, the translator, arrived about seven minutes later. So it was about a total of seven minutes and a couple of minutes, probably about seven or eight minutes before the second officer arrived and explained to the passenger and the driver why he had stopped the driver. After that, he, at 7.48, he completed the warning citation but did not give it to my client and tell him he was free to leave. It was not until nine minutes later, after the stop had been explained to the clients that the warning ticket was finally given to my client and he signed it off. They returned his documents to him. He went back to the car, which is about, he started walking back to the car, which is about 20 feet, 20 yards, 20 yards away from the police officers. The stopping officer called him back to walk back to his sheriff's unit and said that he wanted to ask him some other questions. My client didn't answer that, but they started asking him questions and they told him, wait here, we're going to go talk to the passenger. They went to talk to the passenger and they did things while they were, they said while they were talking to the passenger, they were going to check the van, even though he didn't suspect that the car was stolen. And then he walked back to my client and my client asked him, are we all done now? Are we all done now? And the officer said, I guess I'd like to call my daughter and wake her up and her to get to school on time. And so she can get her and her brother ready. And he said, well, just hold on just a minute. We're going to let you go soon. And then at that particular time, which was about, I want to say 15 or 16 minutes into the stop. And Mr. Gary will correct me if I'm wrong, but at that particular time, because you've got about 20 minutes from what you told us so far, you said the stop happened at seven 38 and he was handed the ticket at seven 57. So that's 19 minutes. Okay. 19 minutes. It's your case. I mean, I'm sure you know, I'm just right. Right. You're right. Your honor. That's that's right. And then once the 19 minutes after that, that's when they started asking for consent to search the car. And then before they asked, before they asked to search the car, they asked if they could ask questions, right? Deputy Mora. Yes. He, he asked if he could ask a question and he said, yes. Right. He didn't respond. He just, he just, he didn't, he didn't say yes or no. He just actually asked to the officers, wanting to ask him more questions. Okay. And then after the officer was asking after that, they asked him several other questions. First, they asked him before they asked for him to sign the search, the consent to search document. They asked questions regarding what was irresponsible for everything in the car. And then he said, after a couple of questions back to the officer said, well, really my, my property is the backpack, a black backpack, and that's in the back of the car. Then after that, they asked several other questions regarding whether or not, whether or not they had any drugs on them. If they had $10,000 or more cash, if they had cocaine, if they had marijuana, if they had any other kind of drugs with them. And my client said, no. And then after that, they told him, well, wait here. Would you agree to search the car? And my client did not answer that question verbally, whether or not he agreed to search the car. He said, I'm going to give you this form. We're going to ask you to read it and sign it. If you agree. And given that form in Spanish, right? The form was in Spanish, but it wasn't explained to him. It wasn't read to him that it, that officer did ask him if he understood. And he said, yes. And he did sign the form. It was the same form that both of them signed. It was a passenger and, and the driver. And anyway, so he consented, but he consented after all these coercive facts were present as well. In addition, they had already kept them and were asking him. And he, he was told to wait by the car several times. They would not let him leave that area. And then, so my argument is that it was a show of authority. It was an acquiescence to a show of authority of the police officers. He was very competent. Evaluate that under the clearly erroneous standard, correct? Because the district judge on the motion to express found that both the consent to ask questions and the consent to search that those were voluntary. So for us to reverse on the, on the argument that you're making, is it correct that we have to conclude not only that the judge was wrong, but that he was clearly wrong. He was clearly erroneous. That, that is the correct standard, your honor. Okay. And so if, if I may, I only have two minutes left, so I'd like to reserve those for rebuttal if I may. You may, and that gives you a lot of time for rebuttal, but that's reserved. All right. Thanks. Thank you. My turn? Yep. Your turn. Thank you very much. My turn, my turn. One thing, as I go through this, I do have a, a counting of the times of every event from start to finish. And it may be of some assistance to the court, I hope so. But first of all, there is a cast on this case that I think needs to be addressed. It starts from the initial stop. I'm not going to spend a lot of time talking about the initial stop because the facts relating to the initial stop are what they are. I don't think they're sufficient to justify the stop, but it sure looks like an interdiction stop, which it was because these guys were working highway interdiction. And it looks like either a profile stop or some other pretextual stop. I don't want to argue myself into Wren versus United States because I understand the implications of that case, but it does put a cast on what happens next. Because what we need to do in this case, I think, is we have to somewhat define what is the mission for purposes of Rodriguez versus United States? What things can they do as part of the mission and still have it not exceed the scope of what should happen during a traffic stop? Technically, this was just a traffic stop. In reality, it doesn't look that way. But what happens is- What did the Supreme Court mean by mission in Rodriguez? That's exactly the issue that we need to address. And what I mean by that is, sure, they can take the guy's driver's license, his proof of insurance, his registration. They can ask some general questions, but really very limited. Once the guy has proven his authority to drive the car and has signed off on the ticket or the warning or whatever they're it's supposed to end and he's supposed to be able to go then. In this case, what actually happens- Is it defined generally such as, for example, well, we stopped him because we had a license plate number and we suspected him of burglary. That kind of a stop, that would be the mission. We stopped him for suspicion of burglary. Whereas we stopped somebody for a routine traffic stop because he was going five miles over the speed limit or whatever, that would be a traffic stop. In those kind of general words, what kind of a stop was this? Yeah. This case was a traffic stop and it should have been limited as a traffic stop should be. This was not a burglary investigation. Ostensibly, it was not a drug investigation. The only things that needed to be asked was, why did you hit the white line twice? Is everything okay? Let's see your license, your insurance. In this case, the driver, who was Martinez-Torres, showed his driver's license, showed the proof of insurance, and he was on the insurance. The registration was in somebody else's name. All of that happened within about the first three minutes of the stop. The officer had already agreed or decided- The first three minutes had the issue of ability to communicate in English, capable of understanding the questions, had all that been determined? They had managed to get through it okay, except that it was pretty clear that there was a language barrier. They did call what turned out to be Deputy Mauricio to do translations. We have not contended, at least I have not contended, that the several minutes it took for Deputy Mauricio to get the scene was a constitutional violation of any kind. It seems reasonable enough. They might have been able to get away without it, but it was reasonable enough. So we would start the clock running not at 7.38, but at 7.45, is that correct? A little later than that, actually. About 10 minutes. Sorry, I hate to give up. What? It was about 10 minutes. Yeah, exactly. That's what I was about to say. Actually, Mauricio arrives, as far as I can tell, at 9.39. There's a reference on the transcript of the audio of his belt recorder where somebody says, here he is, and that's basically 9.39. Now, 9.39, into the stop. What happens at that point is instead of having Mauricio start to really explain the traffic ticket to Martinez Torres, there's some discussion between Mauricio and Mora that goes on until just about 10.40, where there's some description by Mauricio to Martinez Torres about this, but he doesn't really get into the details of explaining the ticket itself, because at 11.02, they decide they're going to go check the VIN. Now, here's what I'm getting at. They didn't really need to difference in the case law between Klass and Caro and so forth as to what they can or should do. There was no particular need for it, but in this case, there's a difference, and here's where the difference in it plays into two new Tenth Circuit cases, which I cited in a supplemental brief just recently. What happens is they decide they're going to go check the VIN, but what they really want to do is go talk to Gomez Arzate. That's my client. What they do is they go check the VIN, supposedly. There's no real comment about that, but suppose they did. That shouldn't have taken more than about 10 or 15 seconds. It's on the dashboard, and he had the registration in his hand. All he had to do was look at it and say, yeah, it checks. Nobody ever said it didn't check, but they had spent almost three minutes. It's like two hours and, pardon me, two minutes and Gomez Arzate, and what they're talking to him about is not the speeding, pardon me, the line, the fog line violation. They want to know where he's been, where he's going to, what he's going to do when he gets there, where he comes from. He says he's from California. Later on, they think that's a big deal that he didn't say Santa Ana. I'm in Santa Ana right now, and I think I'm in California. I'm pretty sure. In any event, my point is, okay, they use that as a ruse to extend the from Mr. Gomez Arzate so that they can find some basis for extending the detention and getting it down to the point where they can start asking for a search. Mr. Garrett? Yes. Sorry to interrupt you. I don't want you to lose your train of thought, but in U.S. versus Cortez, it was recently decided, didn't the panel say that asking about the travel plans is part of the mission under Rodriguez? Well, that's what I'm getting at in part. Yes, it's part of the mission if they there's a reason for it, but the other thing they say both in Cortez and also the Mayville case, which I cited in court in my supplemental brief, they can't use that, even if it's ostensibly for officer safety. They can't use that to extend the detention so that they can do a general criminal inquiry. That's what they were doing here. Now, I want to backtrack a little. I'm going to run out of time, and I need to say something very quickly. From the very start, three minutes into this stop, Deputy Mora decides there's something amiss here. He doesn't know what. He doesn't have reasonable suspicion, nothing, but there's something amiss. He is not going to let go of this case until he has managed to run it down. That's why the questions about travel plans, that's why the questions go on and on and on. That's the whole reason for it. He also says that, well, later on, he tells the people, you're going to be free to leave. That's a sham. It's a fraud. What it really is, he's trying to set up a Robinette, Ohio versus Robinette situation so he can continue talking. He does that starting at 15 minutes and 57 seconds into the stop. What he says in his testimony is, he had no intention of letting these people go. They were not free to leave. When he said, you're free to leave, it was a lie. It was a lie to support his extended investigation. What happens is, between 11.02 and 15.50, just about, they do this inquiry of Mr. Gomez-Arzadi, which asks him nothing important other than to try and ferret out some sort of discrepancy that they can play against what Mr. Martinez-Torres is going to say. It's obvious what they're doing. There's a stratagem. I cited a case in there that was recognized in Cone, where the stratagem of going back and forth between the two people to some sort of a discrepancy is what they do, and that's why they do it. What happens is, they go into this questioning of Gomez-Arzadi. If you're talking about his officer safety, there's some case law, and it's in Cortez, that says that it's fair game for them to at least try and identify who the passengers in the car are, not to talk to them, but to identify them. I assume that that's for safety purposes, but here, the only thing he asked Mr. Gomez-Arzadi in terms of his identity was, what's your name? He says, Jesus. He doesn't ask him, what's your last name? He doesn't ask him to have a criminal record. He doesn't ask him anything, and they don't run him or Martinez-Torres on any kind of a computer check to see if they're dangerous or anything, so it's not that. They're not doing that. What they are doing is trying to take this interdiction stop and push out, so they get something. When they do that, what happens is, and we start talking about defining the mission for Rodriguez purposes, if we define the mission too broadly, we have abrogated the gist of Rodriguez. What we've really done is, we've gone back to pre-Rodriguez days, when they could ask whatever they want and rummage through whatever they want and see if they could develop probable cause. Now, what happens after this, Martinez-Torres starts to walk off after he gets a warning ticket. He gets about 20 paces, and they essentially yell at him, Guillermo, which is his first name, and he comes back because he's, frankly, ordered to, basically. Nobody would think he was free to leave at that point. From then on, he is asked or he's told to stay at the patrol vehicle through various junctures of conversation that happened thereafter. Well, they do say, Guillermo, can we ask you some questions, right? Yeah, but first, okay, first, they say, Guillermo, and they haven't told him you're free to leave. It's kind of implied because they gave him the ticket, but he doesn't know if he's free to leave or not because they didn't tell him that. At least Mauricio didn't repeat it. It's in the recording that he didn't repeat it. When he comes back, they say, you understand you're free to leave, and we want to ask you some more questions, and so they start asking him basically the same questions that they were asking of Gomez-Arzadi before that to try and compare them up, just like I was pointing out. They're looking for suspicion, but at this point, it's not really a consensual encounter for two reasons. One, I've got 55 seconds left, but one, as to Martinez-Torres, he's being made to stay right where he is at the patrol vehicle and is asked all these questions. As to defendant or appellant Gomez-Arzadi, he's still sitting in the car, and I want to add something parenthetically. At the very start of the detention, Gomez-Arzadi started to get out of the car and ordered him back in, and he was never allowed out at all until about 25 minutes into the site when they're trying to get him to sign the consent form, but other than that, he's been ordered to stay in there the whole time, nor does he know what is happening with Martinez-Torres, and so he's not free, meaning Gomez-Arzadi is detained the whole time because as in Guerrero Espinosa, which I cited in my brief, and also Richardson, when the passenger's in the car and the driver's separated from the car, he's detained because he can't leave without his driver, and that's exactly what happened when I just went red, and I think I just ran out of my time, but if the court has any questions, there is no consensual encounter in this case. These people were held, and they were held for 25 minutes, 27 minutes roughly, until they finally got around to asking the ugly questions about, are there drugs and money in the car, and so on, and even at that, that kind of misrepresented what they were going to look for in terms of searching. One thing, too, in terms of the consent, I think on this case, the facts are uncontradicted. I mean, there's just no contradiction to the facts. I think it's a matter of law, and it's independent review by this court because there is no dispute, and I will add one more fact to that, and then I'll think I'll shut up because I'm in the reds. One more fact to that is that in the Fox case, which is cited by the government, they basically ruled that it was an independent review because the nature of what was said and done is not disputed, and it's really for the court to assess is this a valid consent or not. The consent in this case, as I briefed, was tainted from the very get-go. It was tainted as to the consensual intent, and it was tainted as to the consent to search the car, and I'm over my time, and I better be quiet. Thank you very much, but I'm ready to answer any questions you have. No, that's quite all right. Thank you. Mr. Guaji, is it? Guaji, your honor. Guaji, thank you. May it please the court, Nicholas Guaji for the United States. The question before this panel is whether a traffic stop conducted in a reasonable and courteous manner and lasting only slightly more than 15 minutes, seven of which was spent waiting for a Spanish translator, was so impermissibly extended that it rose to the level of a constitutional violation, and the facts as found by the district court and controlling case law established that indeed it was not extended to that degree, and quite the opposite. The deputies in this case operated with alacrity and were careful to seek permission for everything they did. The 15-minute stop, as you describe it, eventually turned into an hour and a half, correct? That once, there was a period of time before during the traffic stop, and then there's a period of time after they've given their consent to search, which of course is longer. It's about 90 minutes. Now, our timing of it, we also, like Mr. Gary, did time the audio, so I think there's a slight discrepancy in the time of the stop and the time where the encounter actually began, but by that time the deputies probably called it into dispatch saying, I've stopped this car, I'm going to approach the car, so at the zero zero mark is when he exits his vehicle and approaches the Kia, making contact 20 seconds in, where he immediately smells air freshener, and so he testified at the suppression hearing that he knows air freshener is used as a masking agent, and he's personally participated in several stops where it was used as a masking agent, so that's already on Deputy Mora's radar. Upon receiving the driver's license, the registration, and the proof of insurance, he's noticed the discrepancies immediately, and that's something we actually, as an aside, I want to point out to the court. He didn't get a registration, did he? The registration was in the name of a third person, right, and one mistake the government made in its brief was we stated that the passenger, Gomez Arzate, was on the insurance. That's actually not the case. The name on the insurance, which makes this even more bizarre because, as Mora will learn eventually, not at this moment, but eventually, you have a driver driving a car believing it's owned by the passenger. The passenger says it's not my car. It was lent to me by this other person whose name I can't remember, who was my previous landlord, and then you have the insurance for the car registered to the driver who has no property interest in the car at all, but all of that is elicited during the period of 1556, which is the period that Mr. Gary has argued was unconstitutionally prolonged because by 1102, Mr. Mora had already written the warning ticket, and Deputy Mauricio had already explained it to Mr. Martinez, so why does the information that was elicited during that five and a half minute block count? Your honor, in order for that, for Mr. Gomez Arzate's argument to hold water, this court would have to determine that it is impermissible to ask questions related to travel or to check the VIN of a vehicle after the officer has already written the warning and after it has already been translated to the driver. Now, Cortez said you could ask about travel plans, but I don't think Cortez said you can ask about travel plans after you've already written out the warning and after you've explained it to the driver, did it? I mean, this would be a leap, wouldn't it? It would not be a leap, your honor. At this point, you have some issues that have been raised in the mind of the officer that a few additional questions can clarify and we can send the defendants on their way. Now, I don't think the record is as clear as suggested by defense counsel in terms of everything being explained and he was free to go. That was the situation Rodriguez. The officer testified everything was complete. They were free to go, but I was going to hold them so this dog could be run on the car. That's not entirely clear from what happened here. They have a vehicle that's owned by a person that's not present. They wanted to check the VIN number on the vehicle and what is important is they actually asked for permission to check the VIN. So, even if this were improper, they have consent at this point to delay this encounter to check the VIN. Martinez-Torres gives them permission. They approach Gomez Arzate and they tell Martinez-Torres we're going to check the dashboard and we're going to check the door. We're going to physically, you know, we would like to open the door and see the inside and he says yes. They then approach Gomez Arzate. They explain that to him. Is it all right if we speak with you while we check the VIN? He says yes. This is all under the umbrella of consent. So, what is the rationale of Rodriguez? It seems to me that there are two things that have come to grasps with the proposition that general traffic control should not be utilized for broader law enforcement purposes and that you either have traffic control, rather, you either have stops based upon reasonable suspicion that something is going on, which is broader than a traffic stop, or you have mere traffic stops. But the court seems to me is trying to draw a line between the two and that it doesn't want to blur, as I said, traffic control into the broader law enforcement activity. Am I wrong about the way I'm reading Rodriguez? What do you read the rationale of Rodriguez to be? I would say that Rodriguez, and maybe it is akin to what your honor is thinking, maybe it's different, that you start off in a traffic stop with zero reasonable suspicion, whereas if you're doing a whisper stop or drug interdiction, you have these indicators, you might have a little bit more. And the United States' position is that reasonable suspicion isn't an on or off binary decision. A smaller amount of reasonable suspicion can get you a certain amount of delay, whereas a lot of reasonable suspicion can get you a lot more. So, for example, to use an analogy here, when he sees this nervousness, when he notices the air pressure, when he sees the discrepancy, is that enough for 90 minutes? No, arguably it isn't. Is it enough for 90 seconds to speak a little bit longer and say, well, let me follow, let me follow your reasoning here. So at the point of the stop in this case, there is, this is a routine traffic stop. Officers see, touch a line for, on two occasions, and he says, this guy's not being a very careful driver, I'm going to stop him. And they do. At what point following that stop, and I'll give you the seven minutes until the translator arrives, at what point after the translator arrives, does this case switch from a traffic stop to a criminal investigation? Your Honor, as... And what triggered that change? Sure. Your Honor, there is some reasonable suspicion, I think, at the very outset with the air freshener, the discrepancy in the paperwork, and the nervousness. I think that only increases over time. Wait a minute, Judge Bachrach pointed out, I think, to you, that the discrepancy in the paperwork isn't discovered at that point. So let's kind of, let's really stick to the, stick to the facts here. Sure. So you've got an air freshener. The air freshener, he's given the insurance, and he's given the registration, which don't match, they have two different names. The driver's license is from California, the car's registered in Texas. So that's what he knows about 30 seconds into the stop. So the question is whether that, under Gomez-Arzate's argument, that you're simply not allowed to ask anything about that, and you must just simply let that go unless there is a smoking gun, proverbial literal, in the car. So in terms of after the Spanish translator arrives, Deputy Mora learns that, you know, one of the two has said they're going to Amarillo, the other said they're going to Dalhart and Dumas, and that it's, the vehicle belongs to an unnamed third party. And that's at the 13-minute mark, minus seven minutes, about six minutes into the stop, Gomez-Arzate says the vehicle belongs to unnamed third party, that was his landlord. And then you have sort of this nonsensical story about going to a house to clean it or possibly move into it. That's at the 14-minute mark, minus, again, seven minutes, making about seven minutes and 20 seconds. And so you get to about 1450, 1548, again, minus seven minutes, where they, he hands back the paperwork, and he says you're free to go. And Gomez-Arzate says, okay, and I'm sorry, he walks back 20 feet, they call out to him, he returns, they say you're free to go, but we'd like to ask you some more questions. Well, what does free to go mean? Is it free to go means, okay, you're free to go? Or is it just pretext for, hey, I want to ask you more questions, and let's pause and think about this? Sure. I've always been a bit confused by that police practice. I mean, it's not just in this case, it's ubiquitous. You're free to go. But it seems like officers don't really mean you're free to go, right? Well, again, when we're looking sort of what is, does the reasonable person in Martinez-Torres position believe they're free to go, I would say that they wouldn't. So we look no further than Rodriguez's case where he says, okay, I want to... Should we as a circuit, just draw a line and say, if an officer says you're free to go, that stops questioning, period. That's a bright line. And then the officers are going to know that. And if they want to ask additional questions, they can't say you're free to go and then ask more questions. I mean... You could always say that, no, I'm sorry, I'm late already. Thanks. Right. And that's exactly what happened in Rodriguez where he says, hey, would you mind, I want to run the dog around the car. And he's like, no, I'm not going to be okay with that. And so all of that delay was without consent, which is very different than the case here where they have consent... Let me play this out. Let me play this out. So the officer says you're free to go. And the driver says, no, thanks. I don't care. Thank you and goodbye. I'm leaving. And the officer does anything at that point to stop it. Then at that point, we could declare this is no longer a voluntary stop. Yeah. At that point, that would be a seizure. And we'd look to the reasonable suspicion analysis. District court, again, found that there was reasonable suspicion because at this point, we, the person who lent Gomez-Ozarte the car for several months, who he doesn't know the name of, who was supposedly his former landlord, just something smells incredibly bad. And I think at that point, obviously, they can stop and hold them there for an additional period of time. Did these facts develop before he said you're free to go or after you're free to go? Well, before he says he's free to go, he knows that it belongs to an unnamed third party. And those facts were developed before he said... So why did he say you're free to go? Well, there were some that were free to go and there were some that were afterwards. But there's always sort of a line drawing that a district court is in the unenviable position of making, and this court is in. And it's always better if you can do this in a consensual way and the person is willing to speak with you. We don't second guess bad decisions that criminals make because we'd be here all day. But they said, yeah, I'm willing to speak to you. I'm willing to answer your questions. You can check the VIN. So all of these things, everything that happened in this case operated under consent, the search, the VIN, and the question, everything for both defendants. With Mr. Gomez, now he's the passenger. He's seven miles away. And I know that you're arguing that Martinez had voluntarily consented. But if we conclude that he had been detained at that point and that it was coercive, wouldn't we have to agree with Mr. Gary that at least for Mr. Gomez, he could not reasonably perceive that he was free to go because he didn't go anywhere until Mr. Martinez was let go so he could drive him. And I'm glad you brought that up because I wanted to correct the record on that. He's told that Martinez-Torres is free to go and he's told that he is free to go. And then he's asked if he can ask additional questions and he says yes. Even beside that, even if this court were to find everything that happened with Gomez-Arzate improper, there's still an inevitable discovery from Martinez-Torres who gives them permission to search the car. They search the car. They find the drugs. Those drugs are still, you know, they'll have to go get a warrant and get Mr. Gomez-Arzate. But eventually that is going to be used against him later on. So, and one thing I did want to point out about an argument raised by Mr. Gomez-Arzate in his reply that the government somehow waived the Hein versus North Carolina argument. That was discussed by the court and the United States. You know, it's in volume two, pages 309, 310. And then by Mr. Gary himself on 314 and 315. So the early argument being about mistake of law, but Mr. Gary himself raises the case. Hein versus North Carolina raises Hein on 315. So the court considered it, did not make it into the court's ultimate order, but there's no way that that was waived or unknown to the court or not considered by the court. So in terms of a reasonable mistake of law, obviously at a minimum, the driving on the outside of the line, given the vitality of basols, it's never been overruled, would at least be a reasonable mistake of law. And so it doesn't sound like there was a lot of objection and counsel's opening arguments about the traffic stop itself, the initial pullover. So I won't belabor that point, but and one argument that raised by Gomez-Arzate was that there was, as soon as Mora meets with Mauricio, that somehow they immediately turned to investigation, but that's not true. The very first thing he says to him is, I pulled him over because he was swerving within his lane, he had this bent tire that I saw, I don't know what, so the very first thing was, was a traffic stop. And it's not until you get to know, you know, I've been on the bench approaching or somewhere in the range of 25 years and these, your free to go cases are starting to blur for me. I mean, if I could, I think we should have a line of cases called the free to go cases because really, I mean, as I said earlier, these are ubiquitous. The officers are always saying you're free to go and nobody's free to go. Really, I mean, when you've got a police officer standing next to your car, often with one car blocking you from the front, another one from the back end of what is considered a routine traffic stop, it's a little tough to say you're free to go, right? Okay, where am I going to go? Ram the other car in front of me or speed into the interstate? I don't know. I don't know. I guess, do I sound frustrated? Well, I understand. Like I said, it's the free to go cases. You're always free to go. It's like me saying, okay, counsel, you're free to go. No, you're not free to go. You're arguing a case. How could you possibly? I said, what are you going to do? Stand up and say, okay, goodbye, judge. I'll see you later. No, that's not the way it works. Sure. No, we joke in New Mexico about Judge Browning always saying that he's thankful that we've showed up today. It's like, well, we don't really have an option. Exactly. But in terms of the free to go. Okay, counsel, you're free to go now. Well, Terry is what it is. And unless we are to vitiate the idea of consensual encounters generally, I understand that there is, again, may not be in the defendant's best interest to continue to interact with the police, but it's not unconstitutional. What about games? I mean, didn't the recent opinion in games lend support to Ms. Baez's argument that neither one of these gentlemen were free to go since there were the lights going, there were multiple vehicles. And aren't those characteristics that led us to conclude that there was a detention, that it wasn't voluntary interaction with law enforcement in our recent opinion in games? Your Honor, I would rest on the district court's factual findings in regard to the consent that they're not clearly erroneous. I think we said it on page 51. The presence of multiple officers is a factor, but it does not look like they were involved in any way in the investigation. In fact, if you listen just to the audio, you wouldn't know that there was more than two police cars were at the scene, but at the point where the 90-minute overall stop commences. I think the district court said three or four. I believe there's a short video of Officer Garcia pulling up towards the end. I think he might be the last one to show up on scene, but I think they're mainly there to help. So three or four for our purposes? How many officers are in the scene? I think it's also three to four. I don't think anybody was riding with anybody else. But again, let's be conservative and say there was four cars, four officers. Again, they didn't interact or they weren't standing around. I understand. I understand. But if we look at the totality of the circumstances on this free-to-go jurisprudence, and there are four cars and four police officers, whether they show up on the video or not, that's not a particular concern of mine. I'm perfectly free to go when there are four officers there and four cars. Your Honor, at the time the last officer shows up, the search— And I'm not trying to load this case. Honest to goodness, I'm not. Sure. Because I recognize it's a fine line. It's a nuanced line. But I don't know where to draw the line, and that's where I need the help. Sure. And fortunately, Your Honor, you don't have to draw the line. You just have to determine whether it was clearly erroneous for the district court to draw that line and make that decision based on the facts. And one thing is, again, that last officer showed up far after the period of consent was given. So it's unclear how many were, I think, again, the three to four at the time of the consent. But there's no facts at all that they were standing around him, had any weapons drawn. He had a clear path back to his vehicle, unobstructed. It was daytime in full view of the other motorists. These are all factors the Tenth Circuit and other circuits have looked to and said, you know, these are factors that weigh in finding of voluntariness. Now, I'm sure I'll remember 10 things to say the moment I sign off, but I don't have anything further unless this court has questions for me. I have one question. Ms. Maez said, if I remember correctly this morning, that Deputy Mora handed the ticket to Mr. Martinez at the 16-minute mark. He had completed the warning ticket at the 11.02 mark. When is your understanding that the record would reflect that Deputy Mora actually handed the ticket to Mr. Martinez or the warning? Your Honor, it would look like it is at 15.48, but without video, we can't be certain. The one thing I would sum up is everything here operated under the umbrella of consent. Again, the VIN, the questioning, and the search of the vehicle. And I would have just asked this court, you know, I don't think there's a real pushback against the idea of the translator coming, but imagine this wasn't a warning. Imagine this was an actual ticket, which carry with it important duties to either show up in court or to pay a fine or have a bench warrant issued for your arrest. It's important that a driver know what he must do or what she must do in order to comply with the law. So I think it was admirable that if he was interested in exploring the situation for investigation, he would have asked more questions during that seven minutes. He would have used it to kind of prowl around and look, but he didn't. In fact, Martinez tried to speak to him and he's like, you know what, let's just, let's just wait for Spanish speaker to arrive. Well, and there may very well, and I know you argue attenuation from the 1103 to the 1556 bar, but during that five and a half minute segment, how can we not say under Rodriguez, in the absence of attenuation, that the stop was unreasonably prolonged if a deputy more, it didn't hand them the ticket until 16 minutes or 1548. And he had 1102 five and a half minutes earlier, he had already written it out. Your honor. Again, I'm not entirely certain that the, all of the paperwork had been done by that point. I'm happy to take the court court's word for it. That's my memory of the record, but don't we would, you know, we would, we would all, all this operated under consent that they, whether they were given the ticket, you know, the ticket was prepared 10 seconds in so long as all of it operated from consent, which is, I think at the point where he says, do you mind speaking with me? You know, can he answer some questions? Would you mind answering some questions? Would you be okay if I checked the VIN? All right. You know, you're free to go. Would you mind answering some more questions? You realize you're free, you're free to go. It's, it's very difficult to second guess what was going on in Martinez Torres's head, but we just have the record and it here, everything looks consensual. Thank you very much. Well, you don't have to second guess yourself about giving up a lot of time because you haven't. Thank you. You'll be free to go in just a minute. Thank you very much. Go ahead. All right. Counsel, it's yours on the appellant side to divide as you wish. I'm just going to briefly address the court on a couple of points and I'll leave the rest of the time for Mr. Gary. But this, this was a drug interdiction stop from the very beginning. These were sheriffs. This was a sheriff who was waiting in the median of the freeway. The sheriffs don't give people speeding tickets or traffic tickets. They, they, they're there because of the interdiction. He was a task force officer who had 30 days to do the drug interdiction and he was- Would that help you or hurt you? It seems to me that it would hurt you. If this were a drug interdiction case and that there was some sort of probable cause for drug interdiction on that route, that would be adverse to your interests. I don't know. Well, I, I think that it was just all a ruse from the very beginning, the whole stop, the, the reasons for extending the, the prolonging the, the traffic stop and the, that our clients' wills were overborne. And initially they were just, you know, they were just acquiescing to the officer's show of authority. And then after that, there was just no way for them to leave or get out or say, no, I'm not, I don't want to talk to you. They spoke Spanish only. They were kept separate from each other. The officers kept going from one to the other, from one other to the other about four times. My client asked, are you done? Are you done yet? And then they said, no, we're, we're not done yet, but just stay right there. You can't go anywhere. Just stay right there. You're free to leave, but you just stay right there by the truck, by the front of the truck. And then after, after that, they're just continue to acquiesce to the show of authority. There's three officers there, the lights are going, their officers are all standing around. There, there's nowhere else to go. They're isolated out in the middle of the freeway. This case is not a consensual, a consensual case. They may have said the words, see, to the fact that could you, could we check your car? My client said, my client did not say see or yes, the co-defendant did, but my client did not, the driver did not, but you know, he's just letting them do what they said they were going to do, which was searching the car. They started taking the car apart. They searched it for an hour on the side of the road. My client was told to go 25 to 50 yards away to the South of where they were. He couldn't see what they were doing. He knew they were searching it, but he didn't know that they were taking it apart. He could, they could see, he could see enough to, to offer to put the bumper back on. That, that was not my client. I guess one of them did. Well, where was Mr. Gomez in relation to Mr. Martinez at that point? I think Mr. Gomez was 25 yards to the front or to the West of the car. And then my client was in the bushes, 50 yards away. So it's not likely that they could have said, just stop taking the, and you know, stop them from breaking the car down because they, the officer testified several times. I'm not going to let them go. I'm not going to let them go. I have never, I never had any intent to let them go and he didn't. And he tore the car apart. Wait a second. Are you saying that rhetorically or are you saying, or is there anything in the record that in fact says I had no intent of letting them go? Yes. He testified to that like on three different occasions when Mr. Gary asked him. Where do we find that in the record? If you know right off? Yes, I do. Perhaps you could let your co-counsel go and then you could answer. Yes, Mr. Gary. Actually, I could assist on that. On the transcript of the proceedings in the district court, the numbering is page 56. If I can grab it real fast, I think I've got it right here. He basically says, I had no intention of letting them go. From very early on, he said he had some suspicion. This is like at about three minutes in, he had some suspicion and he was not going to let them go. He didn't have any reasonable suspicion, but he had that gut hunch. And here we go. Was that while he was waiting for the other officer to come interpret? Yes, it was. Yes, it was. And he said, he meaning Maura, specifically said two things in his testimony. One was that while he told the people they were free to go, they were not free to go. He had no intention of letting them go and he wasn't going to let them go until he got through the sort of this back and forth inquiry of them until he could uncover enough inconsistencies to go further. Now, one thing I'd like to say, this is really easier in a lot of ways. I'd like to help the court with this part. At 1102, Mauricio has gotten there. He's the translator and he's available to discuss what the ticket's all about. He gives a little bit, but not very much. They then tell Martinez Torres, stay here. We're going to go check your VIN and talk to your passenger. Hold on, counsel. Mr. Giron, would you reset the timer for this gentleman, please? Thank you. Okay. Thank you very much. So what happens is he then goes to Gomez Arzade, who's a passenger in the car. He's been ordered to stay as a passenger in the car. He doesn't tell him he's free to go because he's not. They haven't even given Mr. Martinez Torres his documents back. That doesn't happen for another almost four minutes. And they then start asking Mr. Gomez Arzade a whole bunch of questions about travel plans, but it goes past that. It's more than what's been permitted under the case law. They're starting to ask him, what are you going to do when you get to Texas? Where are you going to live? A whole registered owner. That doesn't come out at that point. They ask him something like, whose car is this? And he says, it's a friend of mine. But neither Mora nor Mauricio ask him, what's the friend's name? That doesn't come up until after 1956 in the sequence of events. And what's happened in the meantime is they went back to Martinez Torres, talked to him, gave him his tickets or his boarding ticket, started to let him go, and then ordered him back. At that point, every time they break, every time they break, they tell Martinez Torres, stay here. What's worse, if you want to know what Martinez Torres was thinking, at about 22 minutes into the stop, Martinez Torres asked if he can make a phone call. And they say, not right now, we're going to let you go soon, which means you're not let go yet. What else could it mean? And so if you want to know what Martinez Torres was thinking, he's thinking, I can't even make a phone call unless I ask him, and then they tell him you can't do it. All right. One second. Mr. Hirono, is there any time remaining for any party at this point? No, Judge. Time is completely used up. All right. Thank you. Counsel, I think we understand the argument pretty well, and we're going to be making a very thorough review of the record. So I want to thank all of you for your arguments this morning, and the cases submitted in counsel are excused. You are free to go.